IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 26, 2021

**STATE OF TENNESSEE v. TERRY LEE GILBREATH**

**Appeal from the Circuit Court for Monroe County**
No. 16-026      Andrew M. Freiberg, Judge

_____

**No. E2020-00971-CCA-R3-CD**

_____

A Monroe County jury convicted the Defendant of rape of a child, and the trial court sentenced him to forty years of incarceration. On appeal, the Defendant contends that: (1) the trial court erred when it did not suppress electronic evidence against him; (2) the evidence is insufficient to sustain his conviction; (3) the prosecutor's closing argument was improper; and (4) the trial court erred when it denied his motion for a new trial. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Chessia Cox, Athens, Tennessee, for the appellant, Terry Lee Gilbreath.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Stephen D. Crump, District Attorney General; and Dorothy Cherry and Clay M. Collins, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant's sexual contact with the victim, who was eight years old at the time. For these events, a Monroe County grand jury indicted the Defendant for one count of rape of a child.[1]

**A. Pretrial Motion**

_____

[1]In a separate multi-count indictment, the grand jury charged the Defendant with aggravated sexual exploitation of a minor, among other offenses.

The Defendant asked that the trial court exclude a video recording found in his home that depicted a man raping the victim. He said that the video recording addressed his charge in the separate indictment of sexual exploitation and did not directly relate to the rape charge. The Defendant asserted that, instead of directly addressing the rape of a child case, the State was trying to take evidence from the second indictment and bring it to the first trial, which would unfairly prejudice the Defendant.

The State asserted that the computer in the Defendant's home contained a video and a still photograph of the rape that was alleged in the indictment.

The trial court ruled:

> What I see is that much like a surveillance camera of a robbery, in this case, the tape itself may also be an especially aggravated sexual exploitation of a minor, creating child porn, but the actions depicted in the videotape, it's the State's theory, is evidence of the rape of a child itself. It is confusing, but I think that, honestly, you might have a Rule 8 motion on the second indictment in the future. . . . [I]f the State is aware of crimes which should have been mandatory joinder, meaning the tape is evidence of the rape of a child, and the physical tape itself may or may not be especially aggravated sexual exploitation of a minor, the State is, pursuant to Rule 8, may not be allowed to try one portion of it, and then if they lose that one portion, come back and say, "Well, pretty much the same proof in a new prosecution, we're gonna get a second bite at the apple." That's a Rule 8 prohibition against the State saving back charges.

The trial court went on to note that the only case being tried at that time was the rape of a child case and that the State had a right to introduce what they believed was a videotape of the crime. The trial court found that the evidence was highly relevant, that it was not evidence of another bad act which should be excluded pursuant to Tennessee Rule of Evidence 404(b), and that it was direct proof of the crime alleged in this case. He denied the Defendant's request to exclude the videotape evidence.

## B. Trial

At the trial, the parties presented the following evidence: Scott Webb, a detective with the Monroe County Sheriff's Department, began investigating this case after Courtney Cusack, with the Department of Children Services, informed him of the allegations made by the victim against the Defendant during an interview at the Child Advocacy Center. The victim told Ms. Cusack that the Defendant had made a video of the two of them engaged in sexual acts and put the video on the Internet. Based on this allegation, Detective Webb applied for a search warrant for the Defendant's home, which he executed on October 5, 2015. Because a computer was involved in the items listed by the search

warrant, Detective Webb brought Shane Harrold with the Monroe County Sheriff's Department, who was involved with electronics.

When the detective executed the search warrant at 10:00 p.m., present at the Defendant's home were: the Defendant; Justice Scott, Josh Carroll, who was the Defendant's stepson; and Tara Shelton. The detective found multiple items related to the allegations, including a green bedspread in the Defendant's bedroom, as the victim had described. Additionally, he confiscated a Samsung camera, tripods, printers, multiple cell phones, a computer, and a canister.

Detective Webb said that, after Officer Harrold viewed the contents of the computer, he informed Detective Webb that a video depicted some purple socks. With the victim's mother's consent, the detective found the socks in a dresser drawer in the victim's bedroom.

At around 1:00 a.m. on October 6, 2015, Detective Webb interviewed the Defendant. The detective provided a copy of that interview, and the court admitted it as evidence.

Justice Scott, who was seventeen years old at the time of the execution of the search warrant, testified that he was friends with the Defendant's son, and he lived in a house with the Defendant, the Defendant's son Josh Carroll, and Mr. Carroll's girlfriend, Ms. Shelton. He explained that, before moving in with the Defendant, he had been living with his adoptive family. Mr. Scott moved in with the Defendant after his adoptive family moved to Georgia.

Mr. Scott identified the computer in the home as belonging to the Defendant. During the year-and-a-half that Mr. Scott lived with the Defendant, he saw a young girl, the victim, come and stay in the home. He said that the Defendant would "babysit" the victim. He said that the victim liked the Defendant "a lot" and, while he was unsure if it was out of the ordinary, it "seemed kind of weird." Mr. Scott noted that the victim was very friendly with the Defendant and that she was physical with him, hanging from his arms. In another incident that gave him pause, Mr. Scott saw the victim still wet from a shower with her hair wrapped in a towel standing in the Defendant's room with the Defendant. He was unsure if the Defendant was in the bathroom with the victim when she showered, and the victim was dressed when he saw the two in the room together.

Mr. Scott recalled a "couple" of occasions when the victim would spend the night at the Defendant's home. He said that, when she spent the night, she slept on the love seat in the living room, and the Defendant slept on the couch.

Mr. Scott recalled the police coming to the home to execute a search warrant and interviewing the Defendant. He said that the Defendant left the home shortly thereafter and did not return.

During cross-examination, Mr. Scott said that he never saw anything directly inappropriate happen between the victim and the Defendant. He further testified that the Defendant did not take the majority of his things when he left the house after the police executed the search warrant. Mr. Scott agreed that everyone in the home had access to the computer confiscated by police. Mr. Scott said that the Defendant had multiple visitors, many of whom were families with children, and that the kids sometimes slept over at the residence.

Tara Shelton, who was also present when law enforcement officers executed the search warrant on the Defendant's home, testified that she lived in the Defendant's home at the time with her boyfriend, Mr. Carroll. After identifying some pictures of the home, she identified a computer that the Defendant kept in the kitchen. According to Ms. Carroll, no one but the Defendant ever used it.

Ms. Shelton recalled that the Defendant met the victim and her parents at a yard sale. The victim's parents did not have the money to purchase something the victim wanted, and the Defendant offered to help. He offered to the parents that the victim could come and stay with him while they got "on their feet." Ms. Shelton noted that, while the victim stayed with them, she would sit on the Defendant's lap to watch television and he would sometimes tickle her. While it never occurred to Ms. Shelton that something inappropriate was happening, she did find their interactions "odd."

Ms. Shelton said that, one day, she was in her bathroom that shared a wall with the Defendant's bathroom. She heard both the victim and the Defendant in his bathroom, and the water from his shower was running. She was unsure if they were showering together, but she was sure they were in the bathroom together.

During cross-examination, Ms. Shelton said that she was fifteen or sixteen around the time of these events and living with Mr. Carroll, who was her boyfriend. She agreed that, when she heard voices in the other bathroom and the water running, it possibly could have been from someone washing their hands.

Shane Harrold, a forensic detective at the time of this investigation, testified that he assisted in executing the search warrant. He and other officers confiscated the Defendant's computer, cell phones, a Samsung camera, and a GoPro camera.

4

Detective Harrold[2] analyzed the Defendant's computer, which showed him as the registered owner. The user name was a name associated with the Defendant, and it was an account that had been physically created on the computer. Detective Harrold said that, on the computer under the user name associated with the Defendant, he found a video file of the rape of a child. The video was stored in the recycle bin, and showed that it had been created on September 12, 2015 at 5:50 p.m. The State then played the video for the jury. Detective Harrold identified some still shots taken from the video. One still shot showed a penis between the buttocks of a small female child. The child was still wearing her pink and white tennis shoes and a pair of purple socks.

The detective said that, also on the computer in the recycle bin, was a still photograph taken on September 12, 2015, two minutes before the video was taken. The details associated with the photograph showed that it had been taken by an LG PX450PQ, a phone found in the Defendant's home, and the GPS coordinates of the photograph showed it had been taken at the Defendant's address. The still photograph depicted a penis penetrating the vagina of a small child. The left hand of the male holding the penis had a small scar or wound between the index finger and the thumb of the hand shown. Detective Harrold then identified a photograph of the Defendant sitting at his computer that showed that he had a mark on his left hand that matched that shown in the video. The detailed properties of the photograph of the Defendant sitting at his computer showed that it had been taken by a Samsung camera, matching one found in his home, and showed GPS coordinates as having been taken at the Defendant's home.

A video found on the Defendant's computer from five days after the rape video, depicted little girls at a gym dancing to loud music, as if at a school dance. Another video, taken a day before the rape video, showed the Defendant and another man, later identified as the victim's father, watching a computer screen. The victim is heard talking on the video, making it clear she was the one recording it, and then she turns the camera on herself and sings "hi" to the camera. Other pictures on the Defendant's computer showed the victim smiling at the camera, and the photograph details showed the pictures were taken on September 6, 2015.

Detective Harrold found on the Defendant's computer a browser history related to his searches for the meaning of the victim's given name. These searches occurred on September 12, 2015 at 6:23 p.m., which was about thirty minutes after the rape video was made. The searches showed that they were made by someone signed in under the Defendant's user profile.

---

[2]While we acknowledge that Detective Harrold was no longer working in law enforcement at the time of trial, we will still refer to him as detective, as that was his position at the time of the investigation.

Detective Harrold also analyzed an LG phone found at the Defendant's home. He noted that there were two user accounts on the phone, "107" and "111." The Defendant's photograph appeared under both user accounts. The victim's full name was listed as a contact on the cell phone report. She was also listed under the applications "What's app," and "Viber." The analytics of the phone showed that the Defendant's phone number and the phone number associated in his contacts as belonging to the victim showed that they had forty-six interactions, for a total duration of one hour and thirteen minutes. The victim's phone called the Defendant eight times, and he called her thirty-six times, three of which were on September 12, 2015.

During cross examination, Detective Harrold testified that a file could be manipulated to show a different creation date but, in his experience, that was not frequently done. Further, if a picture was copied from a phone onto a computer, the computer file may not indicate when the picture was actually taken. He also agreed that the computer did not capture who actually used the computer, and it was possible that someone other than the Defendant used his user identification.

During redirect examination, Detective Harrold clarified that "date modified" showed the date that the file was created on the original device. The rape video was created on the original device on September 12, 2015, at 5:50 p.m. He stated that there were two files on the computer that pertained to the child rape: one was the video and the other was a still shot taken by the LG phone that had the Defendant's picture associated with the user identification. The still shot listed the date taken as September 12, 2015 at 5:48 p.m.

The victim's mother, T.T.,[3] testified that she and her husband had two children, a son and a daughter. Her daughter, the victim, was at a neighbor's house playing during a yard sale. She met the Defendant there, and she brought him to meet T.T. and her husband at their home. T.T. said she thanked the Defendant for bringing the victim home, and she learned that the Defendant had purchased the victim a pair of shoes that she wanted from the yard sale. The Defendant returned a short time later and brought T.T.'s children go-carts and a bicycle.

At some point the victim asked to spend the night at the Defendant's house. The victim told T.T. that the Defendant had grandchildren who were also spending the night, so T.T. agreed to allow the victim to go. T.T. said that her son asked to go as well because he wanted to see the four-wheelers and other vehicles that the Defendant said he owned, but the Defendant said he could not come.

About a month or two months after the victim had met the Defendant, the victim told T.T. some things that had occurred between the Defendant and the victim that caused T.T. concern. Based on this conversation, T.T. contacted the Department of Children's

---

[3]For privacy, we will refer to the victim's mother by her initials only.

Services ("DCS"), and the victim went to Children's Hospital. At the hospital, personnel told T.T. that they could not confirm what had occurred because it had been a week since the alleged incident. T.T. took the victim to the Children's Advocacy Center to be interviewed on October 5, 2015.

During cross-examination, T.T. testified that, immediately preceding her disclosure, the victim came home from school and said that she had told a teacher about what had happened to her. The victim and T.T. sat down on the couch together, and the victim told her about the interactions with the Defendant.

T.T. acknowledged that she took the victim to the hospital in September 2015 and, despite knowing of the allegation and the victim's scheduled interview on October 5, 2015, her husband invited the Defendant to their home on October 4, 2015, to work on the go-carts. She said that the victim was not at their home at the time.

T.T. testified that her father, who lived on the same property as her, is a registered sexual offender for having committed violence against a child. She said that her father lived in closer proximity to her on the shared property in September of 2015, and her children had contact with him.

T.T. agreed that the victim had been untruthful in the past, falsely saying that things at school occurred. The victim had also made a false allegation about her brother in the past, and DCS dropped the case the same day they began the investigation.

T.T. said that law enforcement came to her home after the victim had made her allegations against the Defendant, and they confiscated a pair of the victim's purple socks and the victim's white tennis shoes.

The victim testified that she was twelve years old at the time of trial. She recalled that she met the Defendant at a yard sale. When she told him that she needed a pair of shoes, he bought them for her. She recalled a time when the Defendant accompanied her to a dance with her friends. The victim said that her parents met the Defendant, and she went to his house a "bunch." Sometimes her father took her to the Defendant's house, and sometimes the Defendant came and got her.

The victim recalled sleeping at the Defendant's house on one occasion. He had told her that his grandchildren were going to sleep over, but they did not. The two slept together in the Defendant's bedroom. The victim said that, when they were in his bedroom, the Defendant took her clothes off, and he had his clothes off. The victim said she did not remember what happened after that. She did recognize her shoes when shown a portion of the picture from the still shot of the video, saying that those were the shoes that the Defendant had purchased for her.

7

The victim identified a picture that she had drawn of her being at the Defendant's house. She said that she had drawn the Defendant's bed on the picture and that the words she had written said "to love to [the victim] from [the Defendant]." She then said that, when the two were unclothed in the room together, they were in the bed together, and the Defendant touched her private with his private.

During cross-examination the victim said she could not recall what time of day that this occurred. She said that her privates hurt "a little" after this event. The victim said that she did not go to his house again after these events.

The victim's father testified and confirmed much of the previous testimony. He recalled three occasions when the victim spent the night at the Defendant's home. The victim had said that the Defendant's nieces were spending the night and wanted someone to play with. The victim's father identified the victim's socks in the still photograph of the video.

During cross-examination, the victim's father said that he cut off all contact after he learned of these allegations. He agreed that the Defendant may have come to their home on October 4, 2015, which may have been after the disclosure, but he said he was unsure of the dates.

The defense presented witnesses from the Tennessee Bureau of Investigation ("TBI") who testified about the Defendant's bed sheet submitted for testing. They tested fifteen stain areas on the sheet that were stained, five of which were sent for testing. TBI agents found multiple sperm samples and DNA on the sheets and found DNA from multiple men, none of whom were the Defendant, and a female, who was not the victim. During cross-examination, a TBI agent agreed that she only tested the five areas submitted from the sheet, so there could have been other areas that had DNA on them. She agreed that two of the five stains were inconclusive, so she could not rule out the Defendant as a contributor.

The Defendant re-called Detective Webb, who testified that law enforcement did not attempt to obtain DNA samples from anyone other than the Defendant and the victim for comparison, noting that the victim had told law enforcement that it was the Defendant who had raped her. He said that he was unaware that the victim had an iPad until her trial testimony.

Based upon this evidence, the jury convicted the Defendant of one count of rape of a child. The trial court sentenced him as a Range II offender to forty years of incarceration. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court erred when it did not suppress electronic evidence against him; (2) the evidence is insufficient to sustain his conviction; (3) the prosecutor's closing argument was improper; and (4) the trial court erred when it denied his motion for a new trial.

## A. Electronic Evidence

The Defendant contends that the trial court erred when it denied his motion to suppress the video that depicted a penis between the labia and buttocks of a small female child.

### 1. Mandatory Joinder

In support, the Defendant first contends that the State failed to properly join the charge of rape of a child, alleged in case number 16-026, with his pending charge for especially aggravated sexual exploitation of a minor, alleged in case number 16-341, because the bases for both charges resulted from the same conduct and occurred at the same time. He asserts that, because the State failed to join the charges or dismiss the charge of especially aggravated sexual exploitation of a minor before trial, the State improperly "saved back" the charge, which is prohibited pursuant to Tennessee Rule of Criminal Procedure 8(a). The State counters that any remedy pursuant to a violation of Rule 8 would be that any subsequent prosecution could be dismissed and, therefore, the Defendant is not entitled to relief for this prosecution.

Tennessee Rule of Criminal Procedure 8(a) regarding mandatory joinder requires the following:

> Two or more offenses shall be joined in the same indictment, presentment or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13 if the offenses are based upon the same conduct or arise from the same criminal episode and if such offenses are known to the appropriate prosecuting official at the time of the return of the indictment(s), presentment(s), or information(s) and if they are within the jurisdiction of a single court. A defendant shall not be subject to separate trials for multiple offenses falling within this subsection unless they are severed pursuant to Rule 14.

Tenn. R. Crim. P. 8(a).

Thus, under Rule 8(a), all crimes based upon the same conduct or arising from the same criminal episode that are not lesser-included offenses must be charged in separate counts. *See King v. State*, 717 S.W.2d 306, 307-08 (Tenn. Crim. App. 1986). Failure to do so precludes the State from later retrying a defendant for crimes not charged in the

9

original indictment. *Id.*; *see also Ronnie Dale Gentry*, 2006 WL 891211, at *5 (concluding that Rule 8(a) does not require offenses to be joined where there is no evidence that "the appropriate prosecuting official knew of all of the charges or that all of the offenses were within the jurisdiction of a single court"); *State v. David Lee Kestner*, No. M2004-02478-CCA-R3-CD, 2006 WL 359698, at *5 (Tenn. Crim. App., at Nashville, Feb. 10, 2006) (concluding that the two indictments represented two independently motivated criminal episodes and were not subject to the mandatory joinder rule), *perm. to appeal denied* (Tenn. June 26, 2006). Regarding the policy considerations behind Rule 8(a), the Advisory Commission Comments state:

> This rule is designed to encourage the disposition in a single trial of multiple offenses arising from the same conduct and from the same criminal episode, and should therefore promote efficiency and economy . . . .

> The commission wishes to make clear that section (a) is meant to stop the practice by some prosecuting attorneys of "saving back" one or more charges arising from the same conduct or from the same criminal episode. Such other charges are barred from future prosecution if known to the appropriate prosecuting official at the time that the other prosecution is commenced, but deliberately not presented to a grand jury.

Tenn. R. Crim. P. 8(a), *Advisory Comm'n Cmt.*

This court has previously held that the purpose behind Rule 8(a) "is to avoid piecemeal litigation and to disallow the 'saving back' of charges arising from the same conduct or same criminal episode." *Baird*, 88 S.W.3d at 621 (citing King, 717 S.W.2d at 308; 9 DAVID LOUIS RAYBIN, TENNESSEE PRACTICE SERIES CRIMINAL PRACTICE AND PROCEDURE, § 17:23 (1984)). The court has held that the State's failure to join offenses, when mandatory, prevents the State from subsequently prosecuting the other offenses. *See State v. Quantez Person*, No. W2016-01945-CCA-R3-CD, 2018 WL 447122, at *5 (Tenn. Crim. App., at Jackson, Jan. 16, 2018), *no Tenn. R. App. P. 11 application filed*.

Importantly, as stated, the remedy if the State has violated the mandatory joinder rule by "saving back" one or more charges would be dismissal of any subsequent indictment based on the first indictment. That issue is not presently before us. This appeal does not involve any subsequent prosecution for charges allegedly "saved back" and therefore violative of the mandatory joinder rule, and instead involves the Defendant's rape of a child charge, which the State properly charged and prosecuted. The issue of whether the State should have mandatorily joined the sexual exploitation charge will be an issue for a future court to address, if and when the State moves forward on that charge.

**2. Prejudice**

10

The Defendant next contends that the video evidence was "unfairly prejudicial" in that it was evidence for a different charge that was still pending against him. This, he asserts, denied him his right to a fair trial. He asserts that "the State was allowed to use proof from a case where the [Defendant] had not even been convicted of yet." The State counters the Defendant is not entitled to relief on this claim because he does not argue that the rape video, and still photograph therefrom, were not relevant to the rape of a child offense in this case, and he cites no requirement that a trial court exclude relevant evidence merely because the evidence may be relevant to another case as well.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Even relevant evidence, however, may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Questions regarding the admissibility and relevancy of evidence lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

Tennessee courts have liberally allowed the admission of photographs in both civil and criminal cases. *See State v. Thomas*, 158 S.W.3d 361, 393-94 (Tenn. 2005) (citations omitted). Accordingly, the admissibility of photographs lies within the discretion of the trial court whose ruling will not be overturned on appeal except upon a clear showing of an abuse of discretion. *See id.*; *see also State v. Hall*, 8 S.W.3d 593, 602 (Tenn.1999), cert. denied, 531 U.S. 837 (2000). However, a photograph must be relevant to an issue that the jury must decide before it may be admitted into evidence. *See State v. Vann*, 976 S.W.2d 93, 102 (Tenn.1998), *cert. denied*, 526 U.S. 1071 (1999); *State v. Braden*, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993); see also Tenn. R. Evid. 401, 402.

Notwithstanding this broad interpretation of admissibility, evidence that is not relevant to prove some part of the prosecution's case should not be admitted solely to inflame the jury and prejudice the defendant. *Thomas*, 158 S.W.3d at 394. Additionally, the probative value of the photograph must outweigh any unfair prejudicial effect that it may have upon the trier of fact. *See Vann*, 976 S.W.2d at 102-03; see also Tenn. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]"). In this respect, we note that photographs and a video of a child rape are prejudicial by their very nature. Prejudicial evidence, however, is not *per se* excluded; indeed, if this were true, all evidence of a crime would be excluded at trial. Rather, what is excluded is evidence which is unfairly prejudicial, in

11

other words, evidence which has an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one. *See Banks*, 564 S.W.2d at 951.

In the case under submission, the Defendant was on trial for child rape. The victim testified that the Defendant had touched her vaginal area with his penis. The Defendant maintained his innocence. On the Defendant's computer, under a user name registered to him, computer forensic personnel found a video that depicted a penis going between the labia and buttocks of a small prepubescent child. The victim can be heard in the video, and her socks and shoes are depicted in the video. A small mark, scab or scar, on the left hand holding the penis matches other photographs of a mark on the Defendant's left hand. We conclude that the trial court did not err when it admitted this video. The video, and the still photograph therefrom, was clearly relevant to whether the Defendant had in fact committed the act of child rape. While this evidence is prejudicial by its very nature, it is not unduly prejudicial.

Further, we find no precedent for the Defendant's assertion that this evidence was inadmissible because this evidence was also relevant to prove that he committed the offenses of aggravated sexual exploitation of a minor, by creating a video of himself raping the victim. The fact that he had other charges pending, including the aggravated sexual exploitation of a minor charge, did not make the rape video inadmissible at his trial on the charge of child rape. He is not entitled to relief on this issue.

## B. Sufficiency of Evidence

The Defendant contends that, since the rape video should not have been admitted, the State's evidence included no physical evidence, only the limited testimony of the alleged victim who did "not remember" what happened. This evidence, he asserts is insufficient to sustain his conviction. The State counters that ample evidence, including the video, supports the Defendant's conviction. We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with

innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

Pursuant to Tennessee Code Annotated section 39-13-522 (2019), "(a) Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than eight (8) years of age but less than thirteen (13) years of age." Rape of a child is a Class A felony. "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, *however slight*, of any part of a person's body or of any object into the genital or anal openings of the victim's, the

defendant's, or any other person's body, but emission of semen is not required." *Id.* § 39-13-501(7) (2019) (emphasis added).

We conclude that the evidence is sufficient to sustain the Defendant's conviction. The victim's mother testified that the victim tearfully told her about her interactions with the Defendant, and the victim's mother took her to professionals to interview her. During the interview, the victim made disclosures that led to law enforcement officers seeking and obtaining a search warrant for the Defendant's home. At the home, on his computer, officers found a video and a still photograph depicting a penis between the labia and buttocks of a prepubescent child. The victim identified a portion of that photograph that showed her socks and shoes. She testified that she and the Defendant were unclothed in his room on his bed, and the Defendant touched her private with his private. This evidence is sufficient to sustain the Defendant's conviction for rape of a child. He is not entitled to relief on this issue.

### C. Closing Argument

The Defendant contends that the prosecutor's closing statement was "so inflammatory and/or improper that it affected the outcome of the trial." He points to the prosecutor's reference to multiple acts of rape, even though the Defendant was on trial for only one count of rape. The State counters the Defendant failed to object, so our review is limited to a review for plain error. The State further asserts the Defendant is not entitled to plain error relief on this waived issue because where the prosecutor's arguments were in direct response to defense counsel's closing argument, defense counsel may have made a tactical decision not to object to the arguments, the evidence of the defendant's guilt was overwhelming, and the jury was repeatedly instructed not to consider arguments of counsel as evidence.

The Defendant failed to lodge a contemporaneous objection to the prosecutor's alleged improper statements, so our review is limited to plain error relief. This court may, "[w]hen necessary to do substantial justice, . . . consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial." Tenn. R. App. P. 36(b). This court will grant relief for plain error only when:

> the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal rule of law; (3) the error adversely affected a substantial right of the complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake; that is, the error was so significant that it "probably changed the outcome of the trial."

*State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010) (quoting *State v. Smith,* 24 S.W.3d 274, 282-83 (Tenn. 2000)). The party claiming plain error bears the burden of satisfying

all five criteria as a prerequisite to plain error review. *See id*. Because each factor must be established, we need not consider all five factors when a single factor indicates that relief is not warranted. *State v. Fayne*, 451 S.W.3d 362, 372 (Tenn. 2014) (citing *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007)). "[A]n error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *Fayne*, 451 S.W.3d at 372 (citation omitted).

"While the scope and depth of closing argument is generally a matter within the trial court's discretion, the State is not free to do what they wish," *State v. Jones*, 568 S.W.3d 101, 145 (Tenn. 2019) (citation omitted), and judges must take care to restrict improper argument, *see State v. Hill*, 333 S.W.3d 106, 130-31 (Tenn. Crim. App. 2010) (citation omitted). Because of the State's unique role in a criminal case, the State, in particular, "must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial." *Hill*, 333 S.W.3d at 131. Our supreme court has recognized five general areas of potential prosecutorial misconduct during closing arguments:

> (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge.

*Jones*, 568 S.W.3d at 145 (citing *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003)).

We easily conclude that the defendant has satisfied the first element for plain error relief; the transcript of the State's closing argument is included in the record and clearly establishes what occurred in the trial court. That record indicates that, during closing argument, the Defendant's attorney brought the jury's attention to the differences in the rape video and the picture taken within two minutes of the video. The Defendant's attorney contended that it was not possible that the two were taken in such close temporal proximity and that they must have been two distinct events, meaning that there were multiple rapes. The Defendant's attorney's argument was directed to the fact that, because the images were taken at different times, neither depicted the Defendant. In response to this argument, and during rebuttal argument, the State countered that, even if the theory changed to be that the pictures showed multiple rapes, the Defendant was still guilty of the charged offense of rape of a child.

We do not conclude that the Defendant established that the prosecutor's statements breached a clear and unequivocal rule of law. In our view, it is highly unlikely that the prosecutor's rebuttal argument would inflame the passions of the jury or confuse them so

as to cause them to convict the defendant on the belief that he committed multiple rapes. The State clearly stated during closing argument that it was responding to the Defendant's attorney's arguments that the pictures could not have been taken during the same event. *State v. Terrell*, No. W2019-01023-CCA-R3-CD, 2020 WL 5587415, at *14 (Tenn. Crim. App. Sept. 17, 2020) (finding prosecutor's argument was not improper where it was in direct response to the defendant's closing argument), *no perm. app. filed*.

As further support for our holding, we conclude that review of this issue is not necessary to do substantial justice. Any error by the prosecutor was not so significant that it likely changed the outcome of the trial. The proof against the Defendant was overwhelming, as articulated above. The Defendant is not entitled to relief on this issue.

### D. Motion for New Trial

The Defendant finally contends that the trial court should have granted his motion for new trial because the evidence was insufficient to sustain his conviction and because the cumulative effect of the errors necessitates a new trial. As previously articulated, we have concluded that the evidence is sufficient to sustain the Defendant's conviction.

The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial. *See, State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (citations omitted). To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings. *Id.* at 77 (citations omitted). In this case, we have not found any error committed, and the Defendant is not entitled to application of this doctrine. Accordingly, he is not entitled to relief on this issue.

### III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the trial court's judgment.

ROBERT W. WEDEMEYER, JUDGE

16